**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DUNKIN' DONUTS FRANCHISED )<br>  RESTAURANTS LLC, )<br>  a Delaware Limited Liability Company, )<br>130 Royall Street, Canton, Massachusetts 02021 )<br> )<br>                    Plaintiff, )<br> )<br>    v. )<br> )<br>CENTRAL BAKING COMPANY, INC., )<br>  a Virginia Corporation, )<br>1329 Kenilworth Avenue, Washington, DC 20019 )<br> )<br>                    Defendant. )<br> ) | C.A. No. _____ |

**CERTIFICATION OF JACK LAUDERMILK**

1.      My name is Jack Laudermilk.  I am a citizen and resident of the Commonwealth of Massachusetts, and I make this Certification based on personal knowledge and in support of Dunkin' Donuts Franchised Restaurants LLC's ("Dunkin' Donuts'" or "Dunkin'") Memorandum in Support of its Motion for a Preliminary Injunction.

2.      I am Associate General Counsel for Dunkin' Donuts.  As Associate General Counsel, I am the custodian of and have access to executed copies of all Dunkin' franchise agreements, leases, correspondence, and other related documents and records concerning each Dunkin' Donuts franchise.  This includes the documents and records relating to the Dunkin' Donuts franchise owned by Defendant in this case.  The documents attached hereto are kept in the course of Dunkin's regularly conducted business activities, and it is Dunkin's normal practice to make and keep these documents.  My job responsibilities include being familiar with Dunkin's standards enforcement policy, including overseeing litigation brought by or against franchisees.

I am also familiar with the business of Dunkin' generally, including having knowledge regarding the resources Dunkin' has dedicated toward its intellectual property and the relationship between franchisees' operations and the goodwill associated with Dunkin's marks.

3.      Dunkin' is engaged in the business of franchising independent business persons to operate Dunkin' shops throughout the United States. Dunkin' franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin' and to operate under the Dunkin' Donuts system, which involves the production, merchandising, and sale of doughnuts and related products utilizing a specially designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information.

4.      Dunkin' is the franchisor of the Dunkin' Donuts franchise system.

5.      DD IP Holder LLC is the owner of the trademark, service mark, and trade name Dunkin' Donuts and related marks. Dunkin' Donuts has the exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1960 to identify its doughnut shops, and the doughnuts, pastries, coffee, and other products associated with those shops.

6.      DD IP Holder LLC owns numerous federal registrations for the mark "Dunkin' Donuts," and related marks. Among those registrations are Registration Nos. 748,901, 1,148,165, and 1,159,354. A true and correct copy of these documents is attached hereto as Exhibit A. Each of these registrations is in full force and effect, and is incontestable, pursuant to 15 U.S.C. § 1065.

7.      The Dunkin' Donuts marks have been very widely advertised and promoted by Dunkin' over the years. Dunkin' and its franchisees have expended approximately $612,000,000

million dollars in advertising and promoting the Dunkin' Donuts marks over the last twenty-six

years. *See* Exhibit B (attached hereto). Dunkin' spent approximately $94,000,000 in fiscal year

2000 alone on advertising and promotion. *Id.* As a result, the Dunkin' Donuts marks have

become famous throughout the United States.

8.    Dunkin' and its franchisees currently operate approximately 4,100 shops in the

United States and approximately 1,800 shops outside of the United States. Dunkin' Donuts

shops feature Dunkin' Donuts' distinctive trade dress, including the pink and orange color

scheme, and the frankfurter lettering style. In the more than forty years since the Dunkin'

Donuts system began, millions of consumers have been served in Dunkin' Donuts shops.

9.    As a result of the extensive sales, advertising, and promotion of items identified

by the Dunkin' Donuts marks, the public has come to know and recognize the Dunkin' Donuts

marks, and to associate them exclusively with products and services offered by Dunkin' Donuts

and its franchisees. The Dunkin' Donuts marks are among the best and most widely known

trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts,

representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation.

10.    The goodwill and reputation associated with the Dunkin' Donuts mark are

impaired when a franchisee fails to maintain standards and operates an unsanitary or unclean

business under the Dunkin' Donuts trademarks.

11.    Conduct such as the Defendant's occasionally gains local or even national media

exposure. For example, in the fall of 1995, the nationally broadcast television program *Prime

Time Live* did an expose on standards violations in quick service restaurants. Employees at two

Dunkin' franchises with poor standards were shown on hidden camera displaying improper

hygiene and food preparation techniques. The two franchisees responsible are no longer in the

Dunkin' Donuts system. Previously, WWOR in New Jersey did a televised expose on a Dunkin' shop, accusing it of numerous standards violations. The type of negative publicity suffered as a result of these incidents can endanger Dunkin's long established reputation and goodwill.

12.    Defendant is a Dunkin' franchisee for a doughnut shop located at 1329 Kenilworth Avenue, Washington, D.C. 20019 ("Defendant's Shop") pursuant to a Franchise Agreement dated July 26, 2004 (the "Franchise Agreement"). A true and correct copy of the Franchise Agreement is attached hereto as Exhibit C. Defendant is licensed to use the Dunkin' Donuts trademarks, trade name and trade dress.

13.    Dunkin' provides each of its franchisees a set of manuals and guidelines (collectively referred to hereinafter as the "Dunkin' Manuals") which set forth in detail the procedures, methodology and standards applicable to the operation of a Dunkin' Donuts shop. These documents include:

a.    The Network Administration Manual, which includes detailed sections on Operations Assessment for Customer Satisfaction (Chapter 5), Building and Site Maintenance (Chapter 11), Sanitation (Chapter 13), and Standards (Chapter 14) (a true and correct copy of the referenced materials is attached hereto as Exhibit D);

b.    The Production and Distribution Manual, which includes detailed sections on Cleaning, Sanitizing and Maintaining Production Area Equipment (Chapter 1) and the production and handling of food products (a true and correct copy of the referenced materials is attached hereto as Exhibit E);

c.    The Customer Service Manual, which includes detailed sections on Receiving and Storing Raw Materials (Chapter 1), Service Procedures (Chapter 3), Procedure for Brewing and Serving Coffee (Chapter 4), Heating and Serving Bakery Products (Chapter 6), Making and

Serving Sandwiches (Chapter 7), Procedures for Preparing and Serving Soup (Chapter 8), and Cleaning, Sanitizing and Maintaining Sales Area Equipment (Chapter 9) (a true and correct copy of the referenced materials is attached hereto as Exhibit F); and

d.      The Retail Food Safety System Manual (a true and correct copy of the referenced manual is attached hereto as Exhibit G).

14.     Taken together, the Dunkin' Manuals provide detailed and specific guidance and standards regarding health, sanitation, and safety.

15.     On September 19, 2006, Defendant's Shop was inspected by a representative of the Steritech Group, Inc. ("Steritech"), a third-party hired by Dunkin' to conduct food safety inspections.  Numerous standards violations were identified relating to health, sanitation, and safety.  (A true and correct copy of the inspection form is attached hereto as Exhibit H).

16.     On September 19, 2006, Steritech hand-delivered to Defendant a notice to cure listing standards violations at Defendant's Shop and requesting that these deficiencies be cured immediately.  (A true and correct copy of the notice to cure is attached hereto as Exhibit I).

I certify under penalty of perjury that the foregoing is true and correct.  Executed on this
18th day of October, 2006.

Jack Laudermilk